ALBERT BOLLSCHWEILER

*v.*

PACKER HOUSE HOTEL COMPANY et al.

[Decided October 1st, 1914.]

1. Promissory notes of an insolvent corporation are not either accommodation or *ultra vires* paper, when given partly in consideration of the surrender by a creditor of notes of equal amount by a new corporation, which latter corporation at the same time conveyed to the insolvent corporation all its assets by bill of sale.

2. The fact that it was also a part of the consideration that the stock of the new corporation held by the creditor was to be transferred to the purchasing company and made in part the basis for issuing its own stock to an equal amount, and that this new stock of the purchasing company was to be delivered to the creditor as security for the notes of the purchasing company, does not make the paper accommodation paper.

3. A claim against an insolvent corporation founded in part upon notes of the new company given to him upon the surrender of the notes of the old company upon the transfer of its assets to the new company, and in part ($400) for notes of that amount given to another creditor and transferred to the claimant, should be allowed to the full extent of the notes of the old company surrendered to the new company on the transfer.

4. The Chattel Mortgage statute (*1 Comp. Stat. p. 463 ¶ 4*), requiring "immediate delivery" of the mortgaged chattels, or the "recording" as directed by the act, means "immediate possession" or "immediate recording," and where five days elapsed between the execution and the recording of a chattel mortgage—*Held*, upon the evidence, that such chattel mortgage was not "immediately" recorded as required by the statute, and although as against creditors of the insolvent corporation who became such subsequent to the recording, the chattel mortgage is preferred, it is not a preferred claim against the creditors of the company whose claims arose prior to its recording.

5. Under the Chattel Mortgage statute (*1 Comp. Stat. p. 463 ¶ 4*) the affidavit must set out "the consideration of said mortgage and as nearly as possible the amount due and to grow due thereon," and if the execution of a contract in the chattel mortgage referred to was so essential to the validity of the mortgage as to entitle the mortgagee under the statute to the benefit of at least two days delay against the creditors for the purpose of recording it, it would seem that it must be considered as so much a part of the consideration of the mortgage as to entitle them to have it set out in the affidavit, and the failure to set it out is a fatal objection to the validity of the chattel mortgage.

----

On appeal from determination of receiver allowing and disallowing claims against insolvent corporation.

*Mr. Joseph E. Stricker,* for the receiver.

*Mr. John A. Coan* and *Mr. James S. Wight,* for John N. Peterson, exceptant.

*Mr. Thomas H. Brown,* for exceptant Taylor.

EMERY, V. C.

I will state briefly the conclusions reached on the hearing of the appeals on the claims of Mallon and Taylor.

(1) The claim of William P. Mallon, as allowed by the receiver, must stand. The notes of the insolvent corporation on which it is based are not, as claimed by the exceptants, accom-

modation paper. They were given partly in consideration of the surrender by Mallon of notes of equal amount of the Packer House company, which latter company at the same time conveyed to the insolvent corporation all its assets by bill of sale. The fact that it was also part of the consideration that the stock of the Packer House company held by Mallon was to be transferred to the purchasing company and made in part the basis for issuing its own stock to equal amount, and that this new stock of the purchasing company was to be delivered to Mallon as security for the notes of the purchasing company, does not make the paper accommodation paper. This purchase of the stock of the vendor company, under the act of February 19th, 1913 (*P. L. 1913 ch. 15 p. 28*), amending the forty-ninth section of the Corporation act, may be held to be not full-paid stock under the first proviso of that section, but that question is not now an issue. That act amends the section of the Corporation act which made the judgment of the directors as to value conclusive as to the value of the stock purchased, in the absence of fraud. The subsequent act of the same year (chapter 18, page 32), prohibiting purchases of stock, expressly excepts purchases authorized by the Corporation act. This will include supplements thereto then in force, and include chapter 15 of the same date, authorizing purchases of stock necessary for its business.

The transaction as disclosed by the evidence was substantially the taking over by bill of sale and delivery of possession of the entire assets and property of the Packer House company, and in connection with it, its entire capital stock, by the new company which was organized for the purpose of taking it over and continuing the business, and as part of the consideration gave its notes to a creditor of the vendor company, who was entitled to follow and hold its assets for payment. He surrendered to the new company the notes evidencing his claims as creditor of the old company on receiving from the new company its notes for the same amount. Its notes in his hands are therefore not accommodation. The circumstance that when these notes of the new company were given for the debts of the old company, stock in the new company were given to Mallon as collateral to an amount equal to the stock of the old company, and which he also

held as collateral and surrendered, and the further circumstance that by the provision of an agreement signed by Mallon, the new company and Brevoul, one of its officers, it was agreed that on the payment of these notes of Mallon by the company the stock of the new company held as collateral should be the joint property of Bollschweiler and Brevoul, may, either on the evidence at the hearing or when the question comes to issue, raise the question as to whether this stock in the hands of Brevoul and Bollschweiler is fully paid. But Mallon received the stock of the new company only as collateral, and, in view of the whole evidence given on the appeal as to the circumstances under which the notes were given, this agreement does not, as against him, have the effect insisted on so strenuously by complainant's counsel, of making the new company's notes in Mallon's hands, either accommodation or *ultra vires* paper.

(2) The claim of John S. Taylor is also founded in part upon notes of the new company given to him upon the surrender of notes of the old company upon the transfer of its assets to the new company, and in part ($400) for notes of that amount given to Mallon and transferred to him. The receiver has allowed only the latter amount disallowing the balance of his claim. For the reasons stated in reference to the Mallon claim, Taylor's claim should be allowed to the full extent of the notes of the old company surrendered to the new company on the transfer.

As Mr. Taylor, however, was the principal stockholder of the old company, and on the transfer to the new company was one of the three persons to whom the entire stock of the new company ($19,000) was issued as fully-paid stock for the purposes of the transfer, a question may hereafter arise whether the stock thus issued to Taylor is full-paid stock, and whether, as holder of unpaid stock, he is liable to assessment for payment of the debts of the insolvent company, and whether any amount for which he is so liable should not be set off against his claim. On this proceeding the only question is the validity and amount of the claim.

(3) Claim of *John N. Peterson:* The amount and validity of this claim as a claim against the company for $6,478.25 is not disputed, but it is secured by a chattel mortgage, and its prefer-

ence as against Mallon and Taylor, who became creditors on March 1st, 1913, and before it was recorded on March 6th, 1913, and who seem to be the only creditors of this kind, is disputed. As against creditors who became such subsequent to the recording, the mortgage is preferred. *Roe* v. *Meding (Court of Errors and Appeals, 1895), 53 N. J. Eq. 350, 369.* The statute (*1 Comp. Stat. p. 463* ¶ *4*) requiring "immediate delivery" of the mortgaged chattels, or the "recording" as directed by the act as construed in *Roe* v. *Meding, supra* (at *p. 363*), means "immediate possession" or "immediate recording." There was a further declaration—Mr. Justice Van Syckel (at *p. 359*)—that "immediate" means "as soon as may be by reasonable dispatch under the circumstances of the case;" and in subsequent cases, both in the supreme court and in this court, this construction of the meaning of the term "immediate," as given in *Roe* v. *Meding,* was adopted. *Hardcastle* v. *Stiles (1903), 69 N. J. Law 551;* affirmed, for reasons stated, *70 N. J. Law 828; Brockhurst* v. *Cox (Vice-Chancellor Garrison, 1906), 71 N. J. Eq. 703,* affirmed on appeal, *72 N. J. Eq. 950; Gulden* v. *Lucas (Vice-Chancellor Garrison, 1913), 81 N. J. Eq. 106.* The chattel mortgage in question, given by the Packer House Hotel Company to Pabst Brewing Company and John N. Peterson, was dated March 1st, 1913, and conveyed all the chattels then in the hotel known as the Packer House, in Perth Amboy, or to be afterwards added to or substituted for these chattels. These were the chattels which had been purchased by bill of sale from the Packer House company, executed and delivered on the same day to the Packer House Hotel Company, in connection with the delivery of the notes on this purchase, above referred to, which also took place on the same day, but was a separate and independent transaction. Pabst Brewing Company and Peterson supplied the money which was paid on the purchase, and this chattel mortgage was given in part to secure them for the money advanced in cash, which was paid over that day to the vendors, who, at the same time, received the new company's notes in substitution for the old company's notes, as above stated. Mallon and Taylor do not appear to have had any knowledge of the proposed mortgage given to secure the money advanced to make the

cash payments to them on the transfer. On the day of executing the mortgage, an affidavit as to its consideration was taken by Peterson, in which this consideration is stated to have been

"$4,000 thereof money actually loaned by the mortgagees in order to enable the mortgagor to pay part of the purchase price of the property herein described. The remaining $4,000 to secure the mortgagee, Peterson, for his endorsement of a note made by the Packer House Hotel Company and discounted with the First National Bank of Perth Amboy, N. J., in order to raise additional funds to meet the balance of the purchase price for the property herein described,"

and

"that there is actually due on the mortgage $4,000, and in the event of the failure of the mortgagor to pay the note endorsed by Peterson, then the additional sum of $4,000 will be due, making in all the sum of $8,000."

There was no reference in the affidavit to any other consideration of the mortgage. The mortgage itself, however, is by its terms conditioned not only for the payment of the sum of $8,000 on demand with interest, but is also upon condition that the mortgagor

"pay all other sums which may be due or become due by it to the parties of the second part, or either of them, for merchandise sold to it by either of them, and shall also fully comply with the terms of an agreement between the parties, bearing even date herewith, for the sale of Pabst beer and other merchandise exclusively."

This agreement is only referred to, but is not set out in the mortgage, and the affidavit does not refer to it as constituting part of the consideration. It appears by the evidence that such an agreement to be executed in triplicate was drawn at the time of the execution of the mortgage, signed by the mortgagor and Peterson, and was to be signed by the brewing company. The mortgage and contracts were left with Mr. Gilbert, the attorney of the brewing company, who acted for them in arranging the contract. The papers were left with him at his office in New York upon their execution on Saturday, March 1st, 1913. After the execution of the mortgage and contracts, Mr. Gilbert, being satisfied that the brewing company would approve, delivered checks for the money to be advanced by the brewing company on

account of the purchase price on the transfer from the old company to the new company, and this transfer was completed independently and subsequently on the same day. The execution of the mortgage took place on Saturday after the closing of the public offices, and Mr. Gilbert, before whom as notary public the affidavit as to the consideration of the chattel mortgage had been taken, gave directions for procuring this certificate on the Monday following, and also on Saturday mailed to the Pabst Brewing Company in New York the contracts for their execution and return to him in New York. On Sunday Mr. Gilbert was called to Albany to attend to a case in the court of appeals of New York, and at the time expected to return on Monday. On Monday, March 3d, the brewing company, by its letter of that date, returned two signed copies of the contract to Mr. Gilbert's office. Whether this letter was received on March 3d or March 4th does not appear. On March 3d the certificate of the county clerk to Mr. Gilbert's notarial authority was also received at his office. Mr. Gilbert was unexpectedly detained at Albany and did not return to his office until Wednesday, March 5th. He does not seem to have given, either before leaving for Albany or while there, any directions as to the forwarding of the chattel mortgage for record after procuring the clerk's certificate, and the return of the contracts executed. The transaction had been under his exclusive charge and the chattel mortgage with the contract remained in his office until his return on March 5th, and on that day he sent the chattel mortgage by mail to the county clerk of Middlesex county, where it was received and recorded on March 6th, at eight A. M.

Five days thus elapsed between the execution and the recording of the mortgage, and treating the direction of the statute as to "immediate recording" to mean, as declared by Vice-Chancellor Pitney in *Roe* v. *Meding, 53 N. J. Eq. 358, 359,* "as quickly as the circumstances of the case and the character of the chattels will permit," or, as declared by the appellate court in the same case (*Ibid. 363*), to be "as soon as may be by reasonable dispatch under the circumstances of the case," the question of fact to be decided is, whether applying this test the chattel mortgage, under the circumstances of the case, was "immediately recorded"

as required by the statute. On the part of the mortgagee, it is claimed that the original delivery of the mortgage on Saturday, March 1st, to Mr. Gilbert was in escrow only; that the mortgage, as appears by the terms of it, was to secure not only the payment of money, but the performance of a written agreement therein referred to; that this agreement did not become effective until the agreement itself was signed by Pabst Brewing Company, and not until after its execution had been approved personally by Mr. Gilbert, in whose hands the chattel mortgage had been left in escrow; that as he had no opportunity to give his approval until his return on March 4th, the question as to delay is reduced to the delay of a single day in sending the mortgage by mail from New York. And it is further insisted that the unexpected delay in not sending the mortgage on Monday, March 3d, has been reasonably explained, and that under the decisions such reasonable explanation of the delay in recording satisfies the statute. In my judgment, the contention that delay "reasonably explained" satisfies the statute, cannot be allowed. The statute itself requires "immediate" recording, and, as construed by the courts, recording "as soon as may be with reasonable dispatch under the circumstances of the case." This is a different statutory rule from "immediately recording, unless the delay be explained." The delay may be explained, and this explanation may be entirely satisfactory, as it is in this case, so far as the parties to the mortgage and their attorney, to whom it was delivered for record, are concerned. But that is an entirely different question, I take it, from whether, as between the creditors of the mortgagor and the mortgagee, the mortgage was, under the circumstances of the case, recorded either as quickly as the circumstances permitted or with reasonable dispatch. Circumstances of the case which, among others, have a bearing on the question of "reasonable dispatch," are these: The mortgaged chattels, owned by a New Jersey corporation and located in New Jersey, were conveyed to the mortgagor on March 1st by bill of sale delivered in New York City, at the office of a New York attorney, and the notes representing part of the purchase-money, or arising out of the purchase, were then delivered to the creditors, who became creditors of the mortgagor on that date,

and without, so far as it appears, any knowledge as to a proposed mortgage to be given on the property sold, to secure the payment of portion of the purchase-money paid on the transfer to the person or persons who had advanced it for the mortgagee. The chattel mortgage was executed and acknowledged on March 1st, but in New York and before an officer of that state, which required a delay of at least a day for procuring an official certificate to the acknowledgment. The additional delay in recording or sending for record arose by reason of the New York attorney's engagements in the courts of New York. While this explains the delay it does not, in my judgment, as against these creditors, make the recording or sending for record after this delay either an "immediate recording," as the express terms of the statute require, or a recording "as soon as may be" or "with reasonable dispatch," as construed by the courts.

In the cases referred to by counsel, as adopting by construction the qualification "unless the delay is explained," it appears that *prima facie* the delay in recording was such as to preclude its being considered as an "immediate recording," and the fact that no explanation was given was referred to, not by way of importing a qualifying clause into the statute, but by way of confirming the conclusion justified by the facts which did appear. This seems to be the express declaration in these cases relied on. *Dunham* v. *Cramer* (*Vice-Chancellor Grey, 1902*), *68 N. J. Eq. 151, 158;* *Brockhurst* v. *Cox* (*Vice-Chancellor Garrison, 1906*), *71 N. J. Eq. 703, 706.*

Treating the case as one where the delivery of the mortgage was suspended until the execution of the contract by the brewing company, this took place on March 3d, on which day also the clerk's certificate was procured. The agreements were to be executed in triplicate. On Saturday Mr. Gilbert mailed all three copies (executed by the hotel company and Peterson) to the brewing company, who were to execute all three, and, as appears by the brewing company's letter to Mr. Gilbert of March 3d, to return only two of them to him. The brewing company apparently retained the third copy, and on the mailing of the two signed copies to Mr. Gilbert, for delivery to the other parties, the contract was complete. The retention of the chattel mortgage

from record, or the failure to send it for record either by mail or messenger on the morning of the 4th, was due to the retention of all the papers in Mr. Gilbert's office, pending his return, and his apparent failure or omission to give any directions in relation to the matter during his unexpected absence. He intended and expected, as he says, to be at his office on Monday, and had he been there the mortgage would undoubtedly have been sent or mailed on the 3d or the morning of the 4th. Delay beyond this time, under all the circumstances proved in this case, seems to me to have been a failure to record the mortgage either "as soon as may be," or with "reasonable dispatch." The fact that our courts allow "reasonable dispatch," under the circumstances, to be treated as "immediate recording" under the words of the statute; and have thus by construction extended its terms to a reasonable limit, requires, I think, that in the application of the statute, under this construction, we should continue to keep in mind that the language to be construed is still the direction for "immediate recording," not these words as qualified by an express statutory direction "for reasonable dispatch," or "unless the delay is explained," leaving these expressions to be construed and applied to subsequent cases as being likewise statutory provisions. The original words of the statute are to be kept in view as the rule or standard to be applied in each case, and in giving a "reasonable" application of them to the circumstances of each case, their force and effect must not be practically destroyed by a liberal construction of "explanations of delay." These "explanations of delay," so far as creditors protected by the recording act are concerned, must be equivalent to proof that the recording was "with all reasonable dispatch."

The mortgagee's counsel insists strenuously that the mortgage did not become effective until the contract to be signed by the brewing company was personally approved by Mr. Gilbert, and that this would not have taken place until March 4th on his return. Assuming this to be proved in the case, this would still make a delay until the 5th, and, apparently, a late mail on that day, and this delay of a day, in my judgment, was a failure to record with reasonable dispatch within the terms of a statute for "immediate recording." As to the delivery of the mortgage in escrow

until after Mr. Gilbert's personal approval of the execution of the contract by the brewing company, no direct proof of any such understanding between the parties that Mr. Gilbert should personally approve the formal execution of the contract by the brewing company appears in the case. And although it may have been expected by the mortgagors, as well as Mr. Gilbert himself, that it would be approved by him, yet it appears by his evidence that the substantial matter awaiting the delivery of the mortgage was the approval by the brewing company of the terms of the contract, which, as Mr. Gilbert says, had been agreed on after much discussion, and which had been in a measure finally settled by him, on behalf of the brewing company, but without an opportunity for consultation with them. If the terms were approved, the formal execution and its correctness was a matter entirely within the routine duties of the officers of the company. The contracts were prepared to be signed only by the secretary, the officer who usually affixes the seal, and the formal execution was also a matter as to which any member of Mr. Gilbert's firm could pass on in his absence. There is nothing to indicate, in my judgment, that after the brewing company had in fact actually mailed the contract, properly executed on their part, the chattel mortgage was still to be considered as held in escrow by Mr. Gilbert for his personal approval of the execution of the contract by the company.

But, assuming that it was so held, and that this chattel mortgage did not become valid by delivery until after the formal approval by Mr. Gilbert personally of the execution of the contract, then, on the evidence, a further and apparently a fatal objection to the validity of the chattel mortgage under the recording act appears. This contract between the parties was expressly referred to in the chattel mortgage itself as one of the conditions thereof, and on the theory that the mortgage was not valid until the execution and delivery of the contract, the contract clearly became part of the true consideration of the mortgage. The contract was not, however, set out in the mortgage itself, nor was it referred to in the affidavit as making up any part of the consideration of the mortgage. The mortgage treats the advance of money as the sole consideration of the mortgage. If this contract was

such an essential part of the transaction that the validity of the mortgage depended on its delivery, then, as it now seems to me, either the contract or its substance and effect should have been set out in the affidavit as to consideration. Under the statute (*1 Comp. Stat. p. 463 ¶ 4*) the affidavit must set out "the consideration of said mortgage and as nearly as possible the amount due and to grow due thereon." If the execution of the contract was so essential to the validity of the mortgage as to entitle the mortgagee under the statute to the benefit of at least two days' delay against the creditors for the purpose of procuring it, it would seem that it must be considered as so much a part of the consideration of the mortgage as to entitle them to have set it out in the affidavit.

The chattel mortgage must be held not to be a preferred claim against the creditors of the company whose claims arose prior to its recording.